OCTOBER TERM
**1839.**

Hunter
vs,
Hemphill.

HUNTER v. HEMPHILL.

1. The 2nd sect. of the act concerning ejectments (R. C. 1835, p. 234,) providing that ejectment may be maintained &c. against any person not having a *letter title thereto*, under and by virtue of an entry with the register and receiver &c., was intended simply to place these entries &c. upon the footing of other legal titles, not meaning otherwise to alter any of the established rules and principles governing the action.

2. Where there has been an express reservation of lands for sale by the U. S. and the register and receiver sell the lands so reserved, there can be no doubt, that their acts would at least be held void in any suit in which the U. S. might be a party—But *quære*, are such sales mere nullities, and could a defendant resting on a mere naked possession show them to be such?

3. The mere designation of a claim to land upon the books of the register of the land office by a stranger, is not a sufficient compliance with the provision of the act of Congress of 3rd March 1811 to authorize the register to withhold such land from sale.

4. Whatever irregularites may be committed by the agents of the U. S. in the disposal of the public domain, their acts are to be held *prima facie* valid, and no third person can be allowed to impeach them unless they should be disclaimed by the U. S. Whatever is therefore merely avoidable, when the agents had a general power to sell and when there has been no express reservation of the land sold, the sale is good as to all the world except the U. S. or those claiming under them, and no one standing on a naked possession, shall be allowed to question the validity of such sale.

5. It does not follow that because the register of the land office was not present when certain lands were sold, he necessarily performed that act by deputy. Before that question could be determined it would be necessary to look into the nature of the act performed. If a mere ministerial or clerical act, it might be performed by deputy. If a Judicial act—and the register does for some purposes, and in some matters act as a Judicial officer—as in granting pre-emptions,) the act could not be performed by deputy.

Error to Pike Circuit Court.

Wright for Plaintiff.

1st. That there is not in the record any evidence of the locality of the claim, nor that it embraced the land in question.

2nd. The laying down that claim on the registers map, was not warranted by any law, and was an unauthorized deforcement of the plat.

3rd. The claim as laid down in the map, does not in fact embrace all the land in question.

4th. If Dubruiels claim were of that class intended to be reserved from sale by the acts of Congress, the reservation would be in operation for want of location.

5th. But Dubruiels claim had ceased to exist and the land had become subject to general disposition as other lands a year and more before Hunter's entry. Act of Congress 26th May 1824. Do. 24th May 1838. Rev. Co. p. 234, § 2. 5th Bacon 207–8. 3 Bur. 1259. 6 Pit. R. 691. 7 Pit. R. and 12 Pit.

Campbell & Wells for Defendant.

1st. That to constitute a sale by the register and receiver legal, these circum tances must exist. 1st. There must be public sale. 2nd. That land must be liable to entry by law. 3rd. There must be public officers authorized to sell. 4th. These officers must actually make a sale. The receiver is a public officer and whenever he does an act within the general scope of his power, the law will presume the existence of all the facts necessary to render his act valid. 3 Starkie Ev. 1250. But this is only a legal presumption and may be rebutted by evidence. 3 Starkie Evidence 1252.

2nd. Does an entry with the register and receiver of land not offered at public sale vest a title in the purchaser? The act of Congress establishing the land office at Palmyra permitted the sale by register and receiver of such land only as had been offered at public sale at St. Louis and had not been reserved from sale. See land laws, vol. 1, page 194, sec. 10. Do. 1, do. 294, sec. 3. Do. 1, do. 304, sec. 2 & 3. Do. 2, do. 25. Wirt's opinion.

3rd. The third point is in all respects governed by the same laws and principles as the second.

4th. Can the register lawfully delegate his authority?— It is a general rule that a power given, the execution of which requires skill, or which implies personal trust or confidence must be executed by the agent or officer in person See Paley on agency 148–9. Vesey jr. 251–2–236.

*Opinion of the court delivered by Napton Judge.*

Hunter brought an action of ejectment against Hemphill in the Circuit court of Pike county, to which defendant pleaded not guilty. In support of his title the plaintiff relied

on two certificates of purchase made by the receiver of the land office at Palmyra, the first being for the east half of the south east quarter of section No. 8, T. 53, R. No. 1, containing 80 acres, and the second for the west half of the south east quarter of the same section. The defendant admitted the possession of the land as charged in the declaration, and the plaintiff closed his testimony. The defendant then introduced a copy from the Registers office at Palmyra of the map or plat of Range 1 & 2, west township 53 & 54, on which map is the land in controversy. William Wright, the Register of the land office, testified that he entered upon the discharge of the duties of his office 29th of July 1830, that, on the plat aforesaid, Dubruiel's claim was marked in a feint pencil mark which was on the book when he entered the office, and that he had no knowledge of the time when and by whom the pencil marks were made; that he was not present when the entry was made by the plaintiff, having entrusted the business of his office for some time to Mr. Green, with whom he left blank certificates of application signed by him (the Register); that it was usual for Mr. Green and himself to discharge the duties of both offices in the temporary absence of either; that they mutually deputed each other as agents for this purpose and left blanks signed by them respectively. Mr. Wright further stated, that if he had been present, he could not have permitted the entry of plaintiff, because the land was included within the pencil lines, and he considered it reserved from sale, from that fact; that he does not know that the land in controversy has been offered for sale publicly; that he never offered it for sale, and had frequently refused to permit persons to enter the lands included within the pencil lines because he considered them reserved from sale.

Mr. Jordon testified that in 1818, in company with others, he went to the land sales in St. Louis; that the claim of Dubruiel was not then laid down; that the lands in Range 2 were offered, for sale and many pre-emptions were offered within the lines of Dubruiel's claim as afterwards laid down; that defendant had not been long enough on his land to be entitled to a pre-emption; that in January or Februa-

ry 1819 he again attended the land sales at St. Louis and while there he saw a man, whose name he thinks was Barcroft, marking down on the book of the register a claim which the register told him was Dubruiels claim; that the marks were made with a pencil; that after that he saw but one piece of land sold in the limits of said claim, and that was a piece bought by a Mr. Byers only a part of which lay in the claim, the purchaser (Byers) agreeing to loose that part lying within the claim, if it should be confirmed; that he never saw the land in controversy offered at public sale, either at that place or Palmyra; that he knew of only one sale of any land within the claim and that was a case of relinquished lands sold by Carson, the former register at Palmyra. Hemphill the defendant came to the country in 1816 or 1817 and has been been in possession of the land in controversy ever since. He also went to St. Louis in 1819 for the purpose of buying the land not offered for sale. It was proved by several other witnesses, three or four in number, that they were at the land sales in St. Louis in 1819, and that they did not see the land in controversy offered for public sale; that they understood the lands included in the claim were not offered for sale in consequence of the laying down of Dubruiel's claim; Mr. Byers saw the claim as laid down on the books at St. Louis in 1819, and at his solicitation the register set up his piece for sale, and he bought it, under the circumstances mentioned by Jordan. It was proved by a Mr. Smith that he had applied to enter at the Palmyra office a piece of land within the claim, and the register refused to let him have it; (Mr. Wright register.) He also stated on one occasion, time not mentioned, he went to enter for himself a tract in the claim, and was requested by defendant to enter the land in controversy but on being informed by the register, Mr. Wright. that he (Smith) could not enter his land, because it was within the claim as marked on the book, he made no application for it because his land was in the same situation.

On the part of the plaintiff, it was proved by Henry, that he entered the land marked on the copy of the map at Palmyra at the time recorded on it. On inspection of the

OCT. TERM
1839.

Hunter
vs,
Hemphill.

map Mr. Henry's entry is in Range 1, Township 53, and is the east half of the north east quarter of section 8, and within the pencil marks designating Dubruel's claim. Carson was register and Lane receiver. Carson was not present, but his deputy Jones received the application. Witness told Jones the land was said to be in the claim of Dubruie. Mr. Fitzhugh's entry was a pre-emption right; his application was to Mr. Wright. From an inspection of the plat it seems, that Mr. Fitzhugh entered in Range 1, two pieces, one on the 21st Dec. 1830, and the other on the 23th May 1831, being the south west quarter of Section 6, in Township 56, range aforesaid, and within the pencil marks supposed to designate Dubruiel's claim. Mr. Bennett entered a half quarter section in Range 2 and within the pencil marks, by application to Mr. Wright, the register, which was for pre-emption. Mr. Allison entered three tracts, of 80 acres each, parts of all the tracts lying within the pencil marks designating Dubruel's claim, in range 1 in 1827, and the other two pieces in 1835, Wright was the register, and application made to him. Mr. Templeton, another witness, testified that he bought the east half of the N. W. quarter, of section 5, T. 53, Range 1, west, on the 1st August 1831, at public sale; gave more than the minimum price for his land, and obtained a patent for his land in about six months thereafter. This entry is also within the claim of Dubruiel, as laid down on the map. Mr. Wright was the register at the time, and the sale was made by him. Mr. Templeton stated that his piece was formerly claimed by pre-emption and perfected, and thereupon sold, some said it was relinquished. Other witnesses testified in relation to their entries as marked on the plat.

On this state of facts, as appears by the bill of exceptions, the defendant moved the court to instruct the jury;

1st. That if they shall believe from the evidence, that the entry of the defendant of the land in controversy, made in the absence of the register of the land office, by mistake of the person having charge of the register's office, and that the said land had never, at the time of said entry, been offered for sale at public auction, then the said entry of said

plaintiff does not invest him with such a title as will enable him to recover of the defendant in this action.

2nd. That if they shall believe from the evidence that the land in controversy had not (at the time of the plaintiff's entry) been offered for sale at public auction, but had been reserved from sale by the register and receiver, that, in that case, the plaintiff's title under said entry is not sufficient to enable him to recover of the defendant in this action.

3rd. That if they shall believe from the evidence that the land in controversy had, up to the time of the plaintiff's entry, been reserved from sale, on account of said land or a part thereof being supposed to be within the Spanish claim of Antoine Dubruiel, of 10,000 arpents, then the said plaintiff is not entitled to recover of the defendant in this action. Which instructions, as prayed by defendant, were given, and thereupon the plaintiff moved the court to give the following:

1st. That the two land receipts given in evidence by the plaintiff, if the same be true and genuine, are sufficient evidence of title in the plaintiff, to the land therein mentioned to sustain this action of ejectment, unless the defendant, has shown a better title in himself, or some other person.

2nd. That it is not legally incumbent on the plaintiff, in order to give validity to his entries which are given in evidence, to prove that the requirements of the laws of Congress, previous to the sale of the land by private entry, have been complied with.

3rd. The plaintiff is not bound to prove, in order to enable him to recover in this action that the President of the United States had by proclamation appointed a time for the public sale of the lands in question, nor that the said land was ever in fact offered for sale at public auction.

4th. There is no legal evidence that the claim of Dubruil was lawfully laid down upon the map of the register's office, as testified by Mr. Wright and Mr. Jordan.

5th. If the jury believe from the evidence in the cause, that the plaintiff entered with the register and receiver of the land office, at Palmyra the land in controversy and that

the defendant was in possession at the institution of this suit, and if they shall also find from the said evidence, that the defendant has only a naked possession, they ought to find for the plaintiff.

6th. That the defendant cannot maintain a naked possession as against an entry with the register and receiver, by showing that the land had not previously been offered for public sale.

7th. That if the jury shall believe from the evidence in the cause that the plaintiff entered the land in controversy with the register and receiver, at the land office in Palmyra, they should find for the plaintiff, unless the defendant shows by evidence a better title in himself, that is, not in another person.

The court gave the 1st, 5th and 7th instructions asked by plaintiff, and refused the 2nd, 3rd, 4th and 6th and gave all the instructions asked by defendant, and, by way of explanation, instructed the jury further that if the jury believe from the evidence that the supposed entry was made, in the absence of the register, with a person left by him in the charge of his office, and not with himself, they must find for the defendant, because he could not delegate his authority.

After verdict for defendant, the plaintiff moved for a new trial, because of misdirection of the court and insufficiency of the testimony to justify the verdict; which was over ruled. The errors assigned by the plaintiff in this court, are:

1st. That the court erred in giving the instructions asked by defendant.

2nd. The court erred in refusing to give the 2nd, 3rd, 4th and 6th instructions asked by plaintiff.

3rd. The court erred in giving the explanatory instructions for defendant.

4th. It erred in over ruling the motion for a new trial.

Before proceeding to consider the various defences set up in this case, a preliminary enquiry necessarily arises in relation to the proper construction of our statute regulating the action of ejectment. The act provides that an entry with the register and receiver of any land office in the Uni-

OCTOBER TERM
1839

Hunter
vs;
Hemphill.

ted States, shall enable the holder to maintain an action of ejectment against any person not having a better title thereto. It is argued from the phraseology of this act that where the action is brought on an entry with the register and receiver, that title must prevail, unless the defendant can show a better title in himself, and he will not be at liberty to set up title in a third person. There is, it must be admitted, some difficulty in ascertaining what was meant by the better title which the legislature speaks of. We should be more likely however, to arrive at a correct interpretation by looking at the evil, which the legislature proposed to remedy, than by any critical examination of their language. Nearly all the lands occupied by our citizens have been purchased by the United States, and the only evidence of title were these receipts from the federal officers, until the patents issued. In the early settlement of the country, no great inconvenience was felt from the short delays that intervened between the entries at the land office, and the issuing of the patents, but as emigration increased, and the business of the land office multiplied, years would elapse before the purchaser from the government could obtain his patent. It is a matter of history, I believe, that these documentary evidences of title from the land office were believed to constitute, at least, but an equitable title, and consequently would not enable the holders to maintain an ejectment.— The legislature with a view to remedy this evil, declared them sufficient evidence of legal title to maintain ejectment, and intended thereby simply to put them upon the footing of other legal titles; not meaning to alter any of the established rules and principles governing the action, except so far as that point was concerned. If a different construction prevail, and a more literal interpretation be given to the words of the act, the consequence will be that they have not only elevated these titles (by entry, New Madrid locations, pre-emptions, &c.) to the rank of legal titles, but have placed them on a more favorable footing, in a very important particular. They have conferred on them privileges which do not belong even to a patent. The common law rule in actions of ejectment, that the plaintiff must recover on the

The 2nd sect. of the act concerning ejectments (R C. 1835, p. 231,) providing that ejectment may be maintained &c. against any person not having a better title thereto, under and by virtue of an entry with the register and receiver &c., was intended simply to place these entries &c.

II

OCT. TERM
1839.

Hunter
vs,
Hemphill.

:pon the foot-
ig of other
·gal titles,
.ot meaning
·therwise to
·ltor any of
he establish-
d rules and
·rinciples
·verning the
·  ·°·a.

strength of his own title, and not on the weakness of the defendants would be abolished; and though the plaintiff in possession of the receiver's receipt may have passed his title to another, the defendant cannot be permitted to show this in defence, because he has no title in himself, such a construction would be going farther than the evil, which the legislature aimed to remove, would require, and if the argument from inconvenience might be allowed to prevail in any case, this would seem to be one of that description. 4 Bac. Abr. 652.

Believing then that this title is not of such a paramount character as to preclude the same defences, which are admissible in other actions of ejectment, I proceed to examine the nature of the defence set up by Hemphill, and the sufficiency of the evidence to maintain that defence. It is admitted that the entry with the register and receiver is prima facie evidence of title and that it is not incumbent on the holder of such title to prove that various prerequisites of the law have been complied with. But it is insisted that the defendant may show that the entry was illegal and void, and that consequently no title passed from the United States, by such attempted sale. The Supreme Court of the United States, in the case of Wilcox vs. the lessee of McConnell, decided at the January term 1839, have declared that if the register and receiver undertake to grant pre-emptions in land, in which the law declares they shall not be granted, then they are acting on a subject matter clearly not within their jurisdiction, as much so, as if a court, whose jurisdiction was declared not to extend beyond a given sum should attempt to take cognizance of a case beyond that sum. This we understand to be one of the cases in which the entry with the register and receiver would be absolutely void as against the United States, those officers having undertaken to exercise a power not given to them by law, but expressly withheld. This opinion is strengthend by the official opinion of Mr. Wirt, given to the commissioner of the general land office, on the 22nd Oct. 1828, (see land laws &c. vol. 2, part 2, p. 39.) "On the case stated from the general land office, under date of the 6th inst. it is my opinion that no patent ought to issue for lands which have been inadvertently sold without

any legal authority to sell them.  The mistake having been brought to the knowledge of the commissioner of the general land office before the emanation of the patent, lands excepted from sale by acts of Congress ought not to be sold, and if they have been inadvertantly sold, the sale is void for want of authority.  To issue a patent for land, which the government had no power to sell, is a measure which I cannot advise.  Those sales are now in legal contemplation mere nullities."  Such is the strong language of the Attorney General and I quote it not so much as any authority, which indeed the acknowledged abilities of the able jurist who penned it would justly give it, but chiefly with a view to show the light in which the executive authorities of the United States have viewed sales of this description.  There can be no doubt that where there has been an express reservation, and the register and receiver sell lands so reserved, their acts would at least be held void in any suit in which the United States might be a party.  Whether they are void to the extent claimed by Mr. Wirt, and are mere nullites, and a defendant resting on a naked possession can show that to be such, is a question which it is not important to determine.  In this case a majority of the court incline to the opinion that the defence is admissible.  Granting that such defence is good, we proceed to consider the ground taken by the defendant, with a view to establish a title in the United States and to show that the acts of the register and receiver, in allowing Hunter to enter the several tracts of land described in the declaration, were null.  It is urged:

1st. That, in accordance with the provisions of the act of 3rd March 1811, (land laws p. 591) the land in question was expressly reserved from sale in consequence of the claim of Dubrueil for 10,000 arpens.

2nd. That the land never was actually offered at public sale, and consequently was not subject to private entry.

3rd. That the register had no power to appoint a deputy, and there was therefore no sale in fact.

First; It does not appear that either the laws of Congress or the regulations of the commissioner of the general land office have provided any specific mode for complying with

Where there has been an express reservation of land for sale by the U. S. and the register and receiver sell the lands so reserved, there can be no doubt, that their acts would at least be held void in any suit in which the U. S. might be a party—But quere, are such sales mere nullities, & could a defendant resting on a mere naked possession show them to be such?

OCT. TERM 1839.

Hunter
vs
Hemphill.

the proviso to the 10th section of the act of 3rd March 1811, which declares that, till after the decision of Congress thereon, no tract of land shall be offered for sale, the claim to which has, in due time and according to law, been presented to the recorder of land titles in the District of Louisiana, and filed in his office for the purpose of being investigated by the commissioner appointed for a certaining the right of persons claiming lands in the Territory of Louisiana. To show a compliance with its provisions in the case before the court the testimony of Wright and Jordan is relied on. The evidence of Jordon shows, that in 1818, the lands in range 2, within the supposed claim were offered for sale at the land sales in St. Louis, and that various pre emptions were allowed, upon the land included within Dubrueil's claim. This witness further testified, that in 1819, whilst attending the land sales at St. Louis, he saw a man, whose name he thought was Barcroft, marking down in pencil lines the claim of Dubrueil upon the books of the register. Mr. Wright, the register, testified that the lines marking on the map the claim of Dubrueil are in feint pencil marks, and were on the books when he went into office, (29th July 1820) but that he had no knowledge of the time when or by whom the pencil marks were made. No act of Congress expressly reserving this land is shown, nor any other compliance with the provisions of the act of 1811, unless we acknowledge the authority of Mr. Barcroft to designate the claim upon the books of the register. It is true that the commissioner of the general land office, in some instructions to the register at St. Helena, gives some general directions in relation to the ascertainment of private claims, and it is possible, and indeed probable, that similar instructions may have been given to the other registers. On such a state of evidence a jury would hardly infer that there was an express reservation under the act of 1811, but the act of Congress of 26th May 1834 (continued by act of 24th May 1828) expressly provides that persons claiming lands within the State of Missouri, by virtue of any French or Spanish grant, may prosecute their claims before the district court of the State of Missouri. The 5th section declares that any

The mere designation of a claim to land upon the books of the register of the land office by a stranger, is not a sufficient compliance with the provision of the act of Congress of 3rd March 1811 to authorize the register to withhold such land from sale.

claim to lands within the provisions of this act, which shall not be brought by petition before the said courts within two years from the passing of this act, or which after being brought before the said courts shall, on account of the neglect or delay of the claimant, not to be proceeded to a final decision within three years, shall be forever barred, both at law and in equity, &c. The 7th section says, that in each and every case in which any claim tried under the provisions of this act, shall be barred by virtue of the provisions contained therein, the land specified in such claim shall forthwith be held and taken as a part of the public lands of the United State, subject to the same disposition as any other public land in the same district. The act of May 24th 1828 continues in force the provisions of the above named act until the 26th May 1830, and declares that the courts having cognizance of said claims shall decide upon and confirm such as would have been confirmed under the laws, usages and customs of the Spanish government for two years from and after the 26th May 1828, and no longer. The entries of Hunter were made on the 9th and 11th July 1831. It is admitted that the claim of Dubruiel was not confirmed until Nov. 4th 1823, by the then acting board of commissioners in St. Louis. There was a period then of nearly fourteen months, from the 26th day of May 1830 to the 9th July 1831, during which the land was declared by the laws of the United States to be held and taken as a part of the public land of the United State, subject to the same disposition as any other public land in the same district. There was nothing to prevent Hemphill, the defendant, who from the evidence appears to have been living on the land since 1816, from claiming his rights under the pre-emption laws then in force. There was no evidence then that the claim of Dubruiel ever was positively reserved from sale by any law of the United States, and if reserved under the general provision which reserved all lands upon which there was any Spanish or French claim, there was no proof of the existence of any such claim upon the land in question at the time sale was made and certainly no proof of any legally author-

•●T. TERM,
1839.

Hunter
vs,
Hemphill.

ized reservation by the register of the land office, in accor-
dance with the provisions of law.

2nd. The second in tructions given by the court, at the
instance of the defendant, assumes that if the land in contro-
versy had not been offered for sale at public auction, but
had been reserved from sale by the register and receiver,
the plaintiffs title was insufficient to enable him to recover.
This instruction brings up the position assumed by the plain-
tiff in his 6th instruction, and which is the reverse of the
one just recited, which was given for the defendant. The 6th
instruction asked by the plaintiff was, that the defendant can
not maintain a naked possession as against an entry with the
register and receiver, by showing that the land in contro-
versy had not been offered at public sale. The question in-
volved in these instructions is undoubtedly one of immense
importance in this country, where three-fourths, or rather
nine tenths of the land are derived from the General Govern-
ment, and the holders have no better or other evidence of ti-
tle than the receiver's receipt, and in some instances the pa-
tent certificate. Is it true that a defendant in ejectment, who
claims no title under the United States himself, but stands
on his naked possession can avail himself of a defence groun-
ded on the irregularites or misconduct of the government
officers? That the defendant may show title out of the
plaintiff and in the United States seems to be sanctioned, if
not by the express decision of the Supreme Court of the Uni-
ted States, in the Baubin claim, at least countenanced; for
the language of the court is, that where the register and re-
ceiver act upon a subject matter not within their cognizance,
their acts are not merely voidable, but *void*. But it must be
recollected that that was a controversy in which the United
States was substantially a party, Wilcox, the defendant, hav-
ing claimed possession, as an officer in the army in possession
of a military post, under the express order of the Secretary
of War. Admitting the correctness of the decision in that
case, we might well pause, before we adopt in extent the
language of the learned judge who delivered the opinion
without reference to the question really at issue before the
court. It is unnecessary to enter into an investigation of

the distinction between void and voidable acts. It is suffi-
cient to say, that acts which are even held void in com-
mon legal parlance as to some persons are not necessarily
void as to others, and where Mr. Justice Barbour declared
certain entrie·, made with the land officers, of land express-
ly reserved from sale to be absolutely void and null, it cer-
tainly was only necessary he should have declared them so,
as against the United States, and those claiming under them,
A. makes a deed to B. to-day, and to-morrow makes another
deed to C. for the same land, who has his deed regularly re-
corded, and has no notice legal or actual of the first deed, the
deed to B. is said to be absolutely void as to C., though very
good and binding between the parties. The decision of the
Supreme Court in the Beauben case only established that the
defendant in ejectment, o nly claiming under the United
States, could show that the acts of the register and receiver
were absolutely void having been in relation to a subject
matter over which they had no power. Admitting that the
defendant claiming under the United States could set up this
defence, and admitting farther that any defendant who re-
lied on his naked possession could make the same defence,
the instruction of the circuit court given at the instance of
the defendant goes still further, and declares that the defen·
dant may even avail himself of facts in *pais* which could
only make the entry avoidable. To carry the doctrine to
this extent would in our opinion be contrary to established
doctrines and sound policy. Whatever irregularities might
be committed by the agents of this general landed proprie-
tor, the United States, their acts are to be held prima facie
good, and no third person can be allowed to impeach them,
unless the principal should think proper to disclaim them.—
Whatever is therefore merely avoidable when the officers
had a general power to sell, and where there was no express
reservation of the land sold, the sale is good as to all the
world except the United States, or those claiming under
them; and no one standing on a naked possession shall be
allowed to question their validity. It seems scarcely neces-
sary to examine the evidence on this point; the burthen of
proof rested on the defendant and yet the only proof to ne-

*Whatever irregularities may be committed by the agents of the U. S. in the disposal of the public do- main, their acts are to be held prima fa- cie valid, and no third per- son can be al- lowed to im- peach them unless they should be dis- claimed by the U. S. Whatever is*

Hunter
vs,
Hemphill.

therefore merely avoidable, when the agents had a general power to sell and when there has been no express reservation of the land sold, the sale is good as to all the world except the U. S. or those claiming under them, and no one standing on a naked possession, shall be allowed to question the validity of such sale

gative the fact of an offer to sell publicly was founded on the testimony of two or three witnesses, that in 1819, whilst the books were kept at St. Louis, the land in Range 1, and included in the supposed claim of Dubrueil was not allowed to be entered, but that various sales were made in Range 2, which were afterwards embraced within the limits of said claim when traced out on the map in the register's office.—— Various sales are made at St. Louis and in Palmyra, in Range 1, though various applications were made at such place and rejected  If the lands in question were on the 9th of July 1831, a portion of the public domain, coming within the purview of the proclamation of the President of the United States, dated 25th March 1831, it was the duty of the register to offer them for sale; and to allow the defendant to prove that the lands were not in fact offered for sale would be allowing him to take advantage of inadvertencies, irregularities and omissions of duty on the part of those public officers which he has at least no right to complain of.   By looking at the instructions from the commissioner of the general land office to the register and receiver at St. Louis, Franklin, Palmyra, Jackson and Lexington, dated June 25th 1831, (land laws instructions, opinions, &c. vol. 2nd, page 745,) we find that the lands in dispute were directed to be sold.  The circular letter says, the question has been asked whether the unconfirmed private claims in Missouri are subject to sale under the proclamation of the President, dated 25th March last, and after rehearsing the various acts of Congress providing that after the 26th.   1830, those claims shall be barred, proceeds to direct the officers as follows; such unconfirmed claims, therefore formerly reserved from sale under the act of the 3rd March, 1811, as have not been brought before the courts or prosecuted to a final decision under any of the acts of Congress above mentioned, are subject to be offered at public sale, and you and hereby directed to offer the same under the proclamation of the President of the United States above alluded to.  The presumption arising from the facts is therefore against the assumption of the defendant that the lands were never offered for sale.—— We are further of opinion that the defendant should not

have been allowed to show that the land in question had never been offered at public sale, and consequently the 6th instruction asked by the plaintiff was improperly refused.

The third ground of defence assumed in the case was that the register had no right to depute his authority to another much less the receiver, and that therefore the entry was void. The instruction of the court on this point was very broad. That instruction was, that if the jury believe from the evidence that the supposed entry was made in the absence of the register, with a person left by him in charge of his office, and not with himself, they must find for the defendant, because he could not delegate his authority. The court in this instruction place the validity of the entry entirely upon the question of the presence or absence of the register, and then proceed to declare the law arising upon a supposed state of facts, assuming that if the register was absent, he necessarily acted by deputy. The court declare such acts illegal and void. I am unable to perceive how the consequences result which the court assumed would result and how it follows that because the register was not present when a certain act was done he necessarily performed that act by deputy. Before that question could be determined, it would be necessary to look into the nature of the act which was to be performed, if a mere clerical act, it might have been performed by deputy; if a judicial act, and the register does, for some purposes, and in some matters, act as a judicial officer (as in granting pre-emptions) the act could not have been performed by deputy. The instruction assumed the broad position that no act of the register, either ministerial, clerical or judicial, could be performed except in proper person, and left with the jury merely to say whether the act in question was so performed or not. The court erred in giving this instruction.

For the reasons above given, the judgment of the circuit court is reversed and remanded.

clerical act, it might be performed by deputy. If a Judicial act—and the register does for some purposes, and in some matters act as a Judicial officer—(as in granting pre-emptions,) the act could not be performed by deputy.