Points decided.

## DAVID MAHONEY *v.* A. J. VAN WINKLE *et als.*

SEGREGATION OF A SPANISH GRANT.—If, pending proceedings for confirmation of a Mexican grant of a specific quantity of land to be located within the exterior limits of a larger quantity, a survey is made of the quantity confirmed, and a plat thereof is filed with the Court for information, and if after the confirmation the Court sets aside a subsequent survey and orders a new survey to be made in accordance with the first survey, and the new survey does not accord with the first, and is set aside by the Supreme Court of the United States, which Court at the same time affirms the order directing the survey to be in accordance with the first, this judgment of the Supreme Court operates as a final location and segregation of the grant, without any further proceedings or survey.

JUDGMENT ADOPTING A MAP.—A judgment of the Supreme Court of the United States affirming an order directing a survey of a Mexican grant to be made according to a survey and plat on file, makes the survey and plat referred to a part of the judgment by adoption.

MEXICAN GRANT.—A judgment of a Court of the United States directing a survey of a Mexican grant of land to be made in accordance with a survey and plat on file, is a final segregation and location of the grant.

FINAL LOCATION OF GRANT.—When the survey of a Mexican grant has become final by approval, its segregation and location are complete without the issuance of a patent.

FINAL CONFIRMATION OF A GRANT.—Since the Act of Congress of 1860, taking the approval of surveys of Mexican grants from the Executive Department and placing it in the Judicial, the final confirmation of a grant is the final judgment of the Court on the question of location, and not the issuance of a patent.

LIMITATION OF ACTIONS—SPANISH GRANTS.—The Statute of Limitations in relation to Mexican and Spanish grants, commences running from the time of the final approval of the survey, and not from the time of the issuance of the patent.

PUBLIC LAND.—When the Court finally confirms the survey of a Mexican grant of a specific quantity of land to be selected within the exterior limits of a larger quantity, the land within such exterior limits not included in the survey becomes public land, subject to pre-emption and sale.

JUDGMENT IN EJECTMENT.—A person against whom a judgment is recovered in ejectment, and who is removed from the land by a writ of restitution, is not guilty of contempt for re-entering on the land, if an event has occurred after the judgment and before the re-entry which confers upon him the right of possession.

PRE-EMPTION CLAIM.—A person not in privity with the source of paramount title (the United States), cannot question the validity of a pre-emption allowed by the United States.

JUDGMENT IN EJECTMENT.—A judgment in ejectment is not an estoppel as to new matters occurring after its rendition, which give the defendant a title or right of possession; and if such new matters are *in pais,* they may be proved by parol.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

The facts out of which the present controversy arose are fully stated in *Mahoney* v. *Van Winkle*, 21 Cal. 554.

In 1862 an Act was passed by the Legislature of this State which provided in substance that a person dispossessed from a tract of land by the decree or judgment of a Court of competent jurisdiction, and who, not having a legal right to do so, should re-enter and take possession, should be deemed guilty of contempt of the Court by which the judgment was rendered. It was for a violation of this Act that plaintiff claimed Green should be punished for contempt. Upon plaintiff's affidavit an order was made by the Judge of the Twelfth Judicial District, City and County of San Francisco, requiring the respondents to appear before said Court on the 22d day of September, 1866, to show cause why they should not be punished for contempt, and why the plaintiff should not be restored to the possession. Upon the hearing the Court below refused to make the order, and decided that the defendant had not been guilty of contempt. The plaintiff thereupon appealed.

The other facts are stated in the opinion of the Court.

*T. J. Bergin*, for Appellant.

The Court will observe "that on the 18th day of June, 1862, a decree was made rejecting the survey, and ordering a new survey to be made in accordance with the said Ransom survey," and that the mandate of the United States Supreme Court is, "that the decree of said District Court in this cause, entered on the 18th day of June, 1862, be and the same is hereby confirmed;" which leaves the survey still an open and undetermined question. True, the decree is that the survey be made in accordance with the Ransom survey; but this is a matter yet to be done. Originally the survey was to be made of the claim; now the claim is to be surveyed in accordance with the Ransom survey. The obligation to survey according to the claim was no less impera-

tive than to survey according to the Ransom survey. Both are like acts in confirmation and location of the claim.

The United States District Court must determine when the survey is made in accordance with the Ransom survey, as it in the first place had to determine that the survey was made in accordance with the grant or claim.

Before the United States District Court confirms the survey according to the Ransom survey, the lands are no more finally located than they were previous to that survey. True, ordinarily the survey cannot depart from the Ransom survey, under the mandate of the United States Supreme Court, but it is equally true that in the first instance the survey could not depart from the calls of the grant. *Ex necessitate rei,* the mandate cannot *per se* operate a final location, for it merely orders the location to be made in a certain manner. Until location or survey made and confirmed in conformity to the mandate, there is no final location; the lands and their legal *status* remain precisely the same as they were in *Thornton* v. *Mahoney.*

Again: It is only upon the issuance of the United States patent that the claimant becomes clothed with a full legal title to a specific parcel of land, the boundaries of which cannot thereafter be changed or invaded, even by Congress, save in the exercise of the right of eminent domain. Up to that period, no action of the United States concludes them, for the various proceedings to be had under the several Acts of Congress are simply the mode and means adopted in discharge of the treaty obligations of the Government to afford recognition and precision to all claims therein named.

There can be no absolute finality until all legal means of reversal are exhausted; it is only when there no longer remains any power to either party to the proceeding to question the same, that it can, strictly and properly, be said to be absolutely final. This can only be upon the issuance of the patent. (*Johnson* v. *Van Dyke,* 20 Cal. 225; *Castro* v. *Hendricks,* 23 How. 430; *United States* v. *Sampeyreac,* 7 Pet.

222; *United States* v. *Sampeyreac*, Hempst. C. C. 119; *Davis*
v. *Ballard*, 1 J. J. Marsh., Ky., 564.)

Again: Under the ruling in *Caperton* v. *Schmidt*, 26 Cal.
479, the right and title of the parties became *res adjudicata.*
The judgment definitively established the title of the plain-
tiff, and absence of title in defendants, by record evidence
conclusive upon them for all time.

*B. S. Brooks,* for Respondents.

If the *status* of the parties had remained the same as at
the time of the execution of the writ, I admit that the
Court should have granted the order, because then the entry
would have been a clear contempt of the Court which
issued the writ.   But the *status* had changed, as the counsel
admits.   The Supreme Court had fixed the location of the
half league.   The plaintiff no longer had any estate in the
residue of the tract, nor right to its possession; and the
terms of the Act of 1858 gave Green a right to the posses-
sion.   His entry was clearly not an intentional contempt;
it was evidently made in good faith, and under color of title.

The point made is that the half league was not "finally
located," at the time of Green's re-entry, within the meaning
of the Act of 1858.   The land had been *located* by the claim-
ants.   An accurate survey thereof had been made by the
Deputy United States Surveyor, in the course of the judicial
proceedings pending before the Board of Land Commis-
sioners, not as a private, voluntary act of the parties, but in
obedience to a requirement of that tribunal.   An accurate
plat of this survey was presented to the Board, and filed in
its archives, and with the papers of the case was deposited
in the official custody of the United States Surveyor Gene-
ral, and in the transcript of its proceedings, which the Board
transmitted to the District Court, and they to the Supreme
Court of the United States; and as a part of such transcript
was this Ransom survey.   When, therefore, the District
Court, *after* the title had been finally confirmed, and were

proceeding to locate the land by its decree of 1858, adopted the Ransom location as the location of the half league, it was finally located, so far as that Court was concerned; and when the Supreme Court of the United States affirmed that decree, the "location" became absolutely final as to the Government and the claimant. There may be a thousand *surveys* of the land, but there never can be another *location*.

It is next insisted that the judgment in this case determined the title of the plaintiff. All that the judgment determined or could determine was, that the plaintiff had the present right of possession. By the opinion, we know that the right of possession was only to continue until the half league was finally located.

By the Court, SHAFTER, J.:

The plaintiff appeals from an order of the Twelfth District Court, made in proceedings had under an Act entitled "An Act for the punishment of contempts and trespasses," approved April 8th, 1862. (Stats. 1862, p. 115.)

The question presented by the appellant for decision is the constitutionality of the Act of the Legislature entitled "An Act for the protection of settlers on public lands in this State, and to secure the rights of parties in certain cases," approved April 26th, 1858. (Stats. 1858, p. 345.)

The facts are as follows: In 1861 David Mahoney commenced an action of ejectment against the terre-tenants to recover possession of the "Rancho Laguna de la Merced." The complaint alleged ownership and seizin in fee of the demanded premises, without other allegation or reference to the source or character of title. The answer of the respondent Green was a general denial of the allegations of the complaint, with an averment of title in himself to the portion of the premises described in his answer. The case was tried and judgment passed in favor of the plaintiff against the defendants, among whom was respondent Green, for the recovery of the possession of the premises described in the

complaint.  Upon appeal to this Court the judgment was affirmed (21 Cal. 552.)   On return of the case to the District Court execution issued on the judgment, under which respondent Green, among others, was dispossessed, and the appellant Mahoney placed in peaceable possession of the premises recovered, which he continued to occupy and enjoy until September 1st, 1866, when respondent Green took possession of the premises of which he had been dispossessed under the judgment and execution.   The case, therefore, stands *literally* within the Act of 1862, under which these proceedings were instituted, to punish Green and his confederates for contempt and for restitution of the premises.

In answer to the order to show cause why he should not be punished for contempt and restitution be made, Green in substance admits the recovery of the judgment and its execution against him; avers that the plaintiff deraigns title through an inchoate Mexican grant, confirmation of which was necessary to impart to it validity; that it was presented to the Board of Land Commissioners for confirmation, pending which a survey thereof was made of half a league from east to west and a league north to south, the grant being for a smaller quantity within a larger exterior area, which survey was filed among the archives of the Board; that the Board confirmed the claim to the extent of half a league and no more; that the confirmation of the claim has become final; that it was customary to make surveys of claims pending proceedings for their confirmation before the Board of Land Commissioners, under sanction of the Board and direction of the attorneys of the claimants, and to conform their locations according thereto; that the survey in this instance was made by Ransom, a deputy of the United States Surveyor General for California, under the direction or with the consent and approbation of the attorneys of record of the claimants, whose claim to that half league was recognized and was so represented upon the public maps of the County of San Francisco—this survey was made in 1853; that after this Green settled upon the premises in contro-

versy as a settler upon public lands of the United States in good faith; that in 1853 he filed his declaratory statement, embracing said land, with the United States Land Register, then at Benicia; that December 4th, 1862, he produced before the Register of the Land Office the proofs required by the Act of Congress from him as a pre-emptor to perfect his title—paid the requisite amount to the Receiver and received a duplicate receipt therefor, the original of which was forwarded to Washington; that he has not yet received, but hopes to receive, a patent for the land; that the decree of confirmation of the claim was made January 13th, 1858, and was sometime afterward made final by stipulation in the United States District Court; that a survey of the claim was made by the United States Surveyor General, which did not conform to the Ransom survey; upon exceptions to which, such proceedings were had that on the 18th day of June, 1862, the District Court rejected the survey and ordered a new survey to be made in accordance with the Ransom survey; that after the plaintiff became the purchaser of an interest in the premises, and pending these proceedings, he brought this suit and recovered judgment— when Green, with many others within the exterior limits of the grant, but outside of the Ransom survey, were ejected. This was in 1863.   Upon return to the United States District Court of the new survey ordered to be made, which was not in accordance with the Ransom survey, objections were again filed to it, and such proceedings were afterward had that the survey so returned was confirmed.

That an appeal was taken from this decision to the Supreme Court of the United States, and after argument, that Court made the decree given in the transcript, the material portion of which is: " And it is further ordered by this Court that the decree of said District Court in this cause entered on the 18th day of June, 1862, be and the same is hereby affirmed. You are therefore commanded that such further proceedings be had in said cause in conformity to the opinion and decree of this Court as, according to right and justice, and the laws

of the United States, ought to be had, the said appeal not-withstanding." That, believing this decree of the United States Supreme Court operated a final location of the claim, and operated to determine the interest of the plaintiff in all lands outside of the Ransom survey, he, the defendant, re-entered upon the premises in controversy under the Act of 1858. All intentional contempt or disrespect is dis-claimed; as also, all force and violence, in re-entering, on the part of Green. A counter affidavit was offered, which, upon objection and under exception of appellant, was ex-cluded from consideration; but as the facts of the affidavit have no bearing upon the constitutional question to which the argument for the appellant has been confined, it may be dismissed from consideration.

We do not consider the question of the constitutionality of the Act of 1858 to be a turning point in the decision of this appeal; and for the reason that the re-entry complained of finds its justification in the principles of the common law. On the facts of the record, the United States owned the premises in question, and as owner they not only authorized the defendant to enter, but for a consideration paid, imparted to him the equitable, if not the legal right, so to do.

The Mexican grant under which the plaintiff claimed the land originally was of a half league within boundaries con-taining a much larger quantity, and he was entitled, under the decisions in this State, to possess the whole area until the half league should have been segregated under the Acts of Congress. Such segregation was accomplished, as we consider, in 1865, at the December term of the Supreme Court of the United States, by its decree reversing the decree of the District Court establishing the survey of June 15th, 1863, as " a good and valid survey " of the half league, and confirming the decree of June 18th, 1862, ordering a survey to be made in accordance with the Ransom survey, a plat of which was then on file in the proceeding and a copy of it, as we must presume, before the Court. This determination of the Supreme Court fixed the location of the half league under

the calls of the grant. Nothing remained to be done thereafter, except service purely ministerial in its character. True, a question might have arisen upon a plat subsequently filed as to whether it complied with the decree in fact; but that would have been a question upon the calls of the decree and not upon the calls of the grant. In a bill to compel a specific performance of a contract to convey, if the defendant should be adjudged to make a deed "in accordance" with a certain draft then on file, the matter in controversy would be fully concluded by the judgment. Any question thereafter arising as to the sufficiency of the deed executed by the defendant as a fulfilment of the judgment would be a new issue, and could be judicially entertained and passed upon without reinvestigating the original controversy on its merits.

It is urged by counsel that the direction in the decree requiring a "new survey to be made in accordance with the said Ransom survey" left the case in the same position that it would have been in if the direction for a new survey had been general and unrestricted. But to read the decree in that way would be a manifest misinterpretation of the intention of the Court. A judgment is but a conclusion of the mind properly manifested; and the conclusion embodied in the Ransom survey, evidenced by the plat on file, became a conclusion of the Court by express adoption. The only new thing to be done within the intention of the Court was to make a duplicate original in the field of the Ransom survey, and file the same in Court.

The point made by the counsel for the appellant that segregation could not be considered as complete until the issuing of a patent, can be maintained neither upon principle nor authority. It was held in *Waterman* v. *Smith*, 13 Cal. 418, that a patent is "evidence only of the pre-existing title made perfect by confirmation and survey;" and in *Natoma W. and M. Co.* v. *Clarkin*, 14 Cal. 551, it was held in terms that "a segregation was made by the decree." It is true as urged for the plaintiff, that the legislative power

has a general control over remedies, but when the plaintiff's claim was segregated by decree in the manner stated, he had obtained all the judicial relief he needed or asked for. Controversy was ended by the redress so judicially awarded, and the general power of Congress over remedies could not be exerted thereafter as to the case of the plaintiff, for want of subject matter. There is nothing in the case of *Sampey-reac et al.* v. *The United States*, 7 Pet. 222, that gives the slightest countenance to the contrary doctrine. The decision in *Johnson* v. *Van Dyke*, 20 Cal. 225, to the effect that the Statute of Limitations. does not begin to run against a Mexican grant until the issuing of a patent, had reference to grants the confirmation and survey of which were anterior to the Act of Congress of April 14th, 1860, vesting the supervision and control of surveys in the United States District Court. Prior to the passage of that Act the ultimate control of surveys was with the Commissioner of the Land Office (*Castro* v. *Hendricks*, 23 How. 438,) and his approval of a survey could be proved only by the production of a patent. But by the Act of 1860, the power in question was withdrawn from the Executive Department of the Government, and therefore, in all cases since arising, the " final confirmation " referred to in our Statute of Limitations must be held to be the final judgment of the Courts on the question of location, and the date of such judgment or the time when it becomes final, must be the *terminus a quo* of the statute period.

Assuming that the plaintiff's half league was finally segregated by the decree of the Supreme Court, it follows that the surplus land within the exterior limits of the grant remained to the United States as the successor of the Mexican nation ; and the right of immediate possession was united in them with the right of property. Considering the Government as a private land owner, the State Legislature could not, even under the State Constitution, transfer either the property or possession to another by a mere edict; and,

58

considering the United States as a Government, the primary disposition of the public lands belongs to it exclusively by convention. If the Legislature had forbidden the United States to enter on the premises, the Act would have been void, and if it had undertaken to give leave, the Act would have been merely idle.

The defendant has succeeded to all the rights of the Government. State legislation hostile to his right of entry, under proceedings or without them, would have been unconstitutional. But the Act of 1858 was in aid of the right, and not against it, and can be criticised upon no other ground than that it was wholly unnecessary.

The objection that the defendant is not in privity with the United States, for the reason that the premises were not subject to pre-emption, is not available to the plaintiff. He has himself no existing relations to the paramount source of title, and therefore cannot raise the question. The defendant claimed a pre-emption under the law; the claim was recognized by the Government by taking and receipting for the purchase money; the defendant has entered upon the bargained property and has made valuable improvements thereon. Thus far there has been no purpose manifested by the Government to repudiate the equitable obligation imposed upon it by the facts. (*Goodlet* v. *Smithson*, 5 Port. 245; *Wright* v. *Swan*, 6 Port. 84; *Bullock* v. *Wilson*, 5 Port. 338; *Gale* v. *Davis*, 7 Mo. 544; *Hunter* v. *Hemphill*, 6 Mo. 106; *Robinson* v. *Forrest*, 29 Cal. 321.) Until such attempt shall have been made by the Government or by some one standing in its place, the question of the defendant's right must be allowed to slumber.

But it is insisted further that the defendant cannot go behind the judgment in the ejectment suit brought against him by Mahoney. The answer to this objection is obvious. The thing forbidden is not attempted here. A new event has happened since *Mahoney* v. *Green* was tried and adjudged; and the legal effect of the event is to confer upon the defendant a present right of possession; a right which

he did not have at the bringing of the ejectment nor at its conclusion. The new event is *in pais* and may be proved by parol. That point is established by *Caperton* v. *Schmidt*, 26 Cal. 479, and *Grey* v. *Dougherty*, 25 Cal. 266.

Order affirmed.

Mr. Chief Justice CURREY did not express an opinion.